485 P.2d 565

Celia R. PEABODY et al., Appellants
and Cross-Appellees,

v.

The CITY OF PHOENIX, a municipal corpo-
ration, et al., Appellees and
Cross-Appellants.

No. 1 CA–CIV 1384.

Court of Appeals of Arizona,
Division 1,
Department B.

June 3, 1971.

Rehearing Denied July 2, 1971.

Review Denied Sept. 21, 1971.

Lewis & Roca, by John P. Frank, Phoe-
nix, for appellants and cross-appellees.

Edward P. Reeder, Asst. City Atty.,
Phoenix, for appellees and cross-appellants
City of Phoenix and Members of Phoenix
City Council.

Hill & Savoy, by George M. Hill, Phoe-
nix, for appellees and cross-appellants
Modern Builders, Inc. and Transamerica
Title Ins. Co.

JACOBSON, Presiding Judge.

In this multiple appeal we are primarily called upon to determine whether the Superior Court of Maricopa County abused its discretion in setting aside a municipal zoning ordinance setting the number of lots within a given subdivision tract, adopted by the Phoenix City Council.

The facts which we consider necessary to this case are as follows:

The property in question comprises approximately 40 acres of land situated north of Camelback Road between 62nd and 64th Streets in the City of Phoenix. Excluding all dedications (primarily exterior roads and streets) required by the Planning and Zoning Commission and Council of the City of Phoenix, the area left for development in this tract is approximately 36.312 acres. The tract lies within a zoning district classified RE–35 (one residence per 35,000 sq. ft. lot). This acreage is equal to 1,581,750 sq. ft., which divided by the 35,000 sq. ft. lot requirement of an RE–35 zoning classification yields a maximum of 45 lots—excluding any internal non-residential uses, such as churches, schools, parks, offices or internal public streets.

Appellee Modern Builders, Inc.[1] applied to the City Planning and Zoning Commission for a rezoning of the subject property pursuant to the Planned Area Development ordinance contained in § 426 of the Code of the City of Phoenix. The Planned Area Development (P.A.D.) ordinance is a development system permitting, among other things, greater flexibility of design, placement of buildings and use of open spaces; it allows some departure from the requirements of the zoning ordinance which it modifies, in the interest of the development of a tract as a unit, while still retaining the basic standard set by the previous existing zoning in the area.

Following the appropriate amendment proceedings, including a contested hearing, the City Council approved Modern Builders' application for a Planned Area Development project (P.A.D. 5–69), which authorized the construction of 44 residences upon the subject property.

Thereafter, appellants who comprise a number of the surrounding property owners, brought this action seeking prohibition and declaratory judgment relief, to contest the zoning determination by the City Council.

The appellants argued both at trial and in this Court that the maximum number of residences which could have been authorized to be built upon the property under the district's zoning classification as amended by P.A.D. 5–69 is 36.

The appellees contended at trial and argue on appeal that the maximum number of residences specifically approved by the City Council's adoption of P.A.D. 5–69 is 44, in compliance with the requirements of the amended zoning ordinance.

Upon findings of fact and conclusions of law the trial court struck down the adoption of P.A.D. 5–69 and declared that the maximum number of residences which could be built upon the property was 40.

From this judgment all parties have appealed.

The principal issue in this case is whether the City Council's adoption of P.A.D. 5–69, authorizing the construction of 44 residences upon a 36.312 acre plot, increased the density above that which would otherwise have been permitted in the district in which the site is located, and if so, whether such action was beyond the authority of the Council.

■ As an initial matter, Modern Builders concedes that some of the 44 residences it planned to build upon the tract would have had lots of less than 35,000

---

1. Modern Builders, Inc. is acquiring the tract through a trust agreement in which Transamerica Title Insurance Company is trustee. Hence, references to Modern Builders, Inc. in the remainder of this opinion should be construed as referring also to the nominal party Transamerica.

sq. ft., but argues that the individual lot size restrictions of RE–35 zoning do not apply when read together in connection with P.A.D. zoning, since the latter section amends the former by allowing this type of flexibility with the proviso that the average of all the lots exceeds 35,000 sq. ft. With this contention we agree. An examination of the requirements of the RE–35 zoning classification and the P.A.D. ordinance reveals the intention of the P.A.D. "density" restriction to reach the ratio of the total number of residences to the net development area of the tract.

Section 426 of the Planned Area Development ordinance provides:

"PLANNED AREA DEVELOPMENT

"A. PURPOSE OF PLANNED AREA DEVELOPMENT

"A planned area development is intended to correlate comprehensively the provisions of this and other ordinances of the City to permit developments which will provide a desirable and stable environment in harmony with that of the surrounding area; to permit flexibility that will encourage a more creative approach in the development of land, and will result in a more efficient, aesthetic and desirable use of open area, *while at the same time maintaining substantially the same population density and area coverage permitted in the district in which the project is located;* to permit flexibility in design, placement of buildings, use of open spaces, circulation facilities, and off-street parking areas, and to utilize best the potentials of sites characterized by special features of geography, topography, size or shape." (emphasis added)

Further, the ordinance goes on to provide:

"4. *Number of Dwelling Units.* The number of dwelling units permitted in any district shall be determined by dividing the net development area of the site by the minimum lot area per dwelling unit required in the zoning district in which the site is located. Net development area shall be that area re-maining after subtracting those portions of the site set aside for non-residential uses, such as churches, schools, parks, offices, and commercial. *The method of calculating density shall be consistent with the method applicable to conventional development in the zoning district in which the site is located.* Subject to the limitations of the total number of dwelling units permitted when the site contains more than one residential district, the distribution of units in the several districts may be adjusted in harmony with the total design and the adjacent area." (emphasis added)

The purpose of the previous existing RE–35 restrictions is:

"Sec. 402. RESIDENTIAL ESTATE RE–35 DISTRICT—ONE FAMILY RESIDENCE

The RE–35, One Family Residence District, is a district of single family homes designed to maintain, protect and preserve a character of development on lots with a minimum area of 35,000 square feet, and with not more than one dwelling unit and customary accessory buildings upon one lot."

At this point it should be noted that the disparity in the mathematical results reached by the trial court and the City Council concerning the maximum number of residences allowable upon this 36.312 acre tract stems primarily from a determination as to whether the 36.312 acre development area is to be reduced by the acreage consumed by internal streets in order to arrive at "net development area." The characterization of this internal street acreage as a "public" dedication has the concomitant effect of reducing the 36.31 acres and consequently the number of allowable lots by an appreciable amount—depending upon how wide one chooses to plan the streets. If, on the other hand, characterization of the internal streets as "private" allows them to be included in the net development area, it would appear to follow that the 44 residences would fall within the maximum number allowable under RE–35 zoning.

The issue squarely turns on the construction to be given the P.A.D. ordinance restriction on the number of dwelling units, that is, "[t]he method of calculating density shall be consistent with the method applicable to conventional development in the zoning district in which the site is located." City of Phoenix Code § 426 F.4. In this connection, the trial judge made the following finding of fact:

"4. In the district in which the site is located, the method applicable to conventional zoning is that the RE–35 standard is regularly applied. Lot sizes in a subdivision are computed by attributing to the lot the space held and used, to a minimum of 35,000 square feet, *excluding roads contiguous to the property,* and the minimum lot area per dwelling unit required in the zoning district in which the tract is located is 35,000 square feet." (emphasis added)

While we entertain no doubts as to the accuracy of this finding regarding the actual practice in the zoning district involved, we do not feel precluded from inquiring into the propriety of the trial court's conclusion of law which supplants the City Council's determination, and necessarily its construction of the density restriction of the P.A.D. ordinance. Arizona Corporation Com'n v. Tucson Ins. and Bond. Ag., 3 Ariz.App. 458, 415 P.2d 472 (1966). Conclusion of Law No. 12 states:

"12. A P.A.D. may not increase the number of homes on a site beyond the number which would be permitted under the method applicable to conventional development in the zoning district in which the site is located. *Here that number is 40.*" (emphasis added)

Inasmuch as the outcome of this appeal turns on the construction to be given this density restriction, it is helpful to look to other portions of the P.A.D. ordinance, where it is provided that the purpose of P.A.D., among other things, is to "permit flexibility that will encourage a more creative approach in the development of land * * * while at the same time *maintaining substantially the same population density * * * in the district* in which the project is located." City of Phoenix Code § 426 A. The ordinance further specifies that:

"[t]he action of the Commission and Council may include the variations of any of the above features in furtherance of the purposes of this ordinance where there exist unusual conditions relating to the property such as topography, drainage, flood hazard, peculiarity of the shape of the site, and where approval of the variation would promote the general welfare of the neighborhood." City of Phoenix Code § 426 G.

Such language imports an element of discretion on the part of the Council to be taken into account in its construction of the P.A.D. ordinance as applied to a particular application.

■ The question thus becomes whether the Council had the power or authority to construe the "net development area" to include the area encompassed by interior contiguous streets which have not been dedicated to the public, in the face of its own density restriction. We find that the Council has such power and authority.

Appellants have failed to cite to this Court any authority which would preclude the construction adopted by the City Council, and we have been unable to discover any from our independent research.

Testimony from both sides at the trial was uncontroverted to the effect that conventional subdivisions exist in the City of Phoenix in which the internal streets are not dedicated to the public. The fact that such subdivisions have not been developed in the particular district in question does not alter the fact that the City Council could authorize such under the RE–35 ordinance alone. See A.R.S. § 9–461. It follows that the number of residences which would be permitted under RE–35 conventional development could encompass the private street concept incorporated in P.A.D. 5–69.

In reaching our determination we find particularly persuasive the fact that those

who have placed the construction upon the ordinance allowing the private streets concept are also the ones who are charged with the duty of administering and enforcing the ordinance. Kubby v. Hammond, 68 Ariz. 17, 198 P.2d 134 (1948).

 The remaining question is whether the trial court abused its discretion in setting aside this ordinance. It is a settled rule of law in this state that a zoning ordinance is cloaked with a presumption of validity. Mueller v. City of Phoenix, 102 Ariz. 575, 435 P.2d 472 (1967); City of Phoenix v. Fehlner, 90 Ariz. 13, 363 P.2d 607 (1961); Hart v. Bayless Investment and Trading Co., 86 Ariz. 379, 346 P.2d 1101 (1959); Edwards v. State Board of Barber Examiners, 72 Ariz. 108, 231 P.2d 450 (1951); City of Tucson v. Arizona Mortuary, 34 Ariz. 495, 272 P. 923 (1928). In *Edwards, supra,* our Supreme Court stated:

"'(W)here an enactment bears any reasonable relationship to the end sought the courts may not substitute their judgment for the judgment of the legislature. * * * Hence the rule which is of universal acceptance that the Courts will acquiesce in the legislative determination of all matters of fact unless it is clearly erroneous, arbitrary and wholly unwarranted.'"

We find that the trial court made no finding and had no basis upon which to conclude that P.A.D. 5–69 was clearly arbitrary and unreasonable and that it had no substantial relation to the public health, safety, morals, and general welfare. Mueller v. City of Phoenix, *supra;* City of Phoenix v. Fehlner, *supra.* We therefore hold that the action of the trial judge in setting aside P.A.D. 5–69 constituted an abuse of discretion.

Appellants raise the contention that the P.A.D. application here involved was a mere subterfuge to achieve the end sought by Modern Builders, Inc., that is, to place more houses than otherwise possible on this tract. In this regard appellants succeeded in obtaining the admission of evidence which showed that Modern Builders had originally made application to have the tract rezoned from RE–35 to RE–24 so that it could place some 47 houses thereon. Following the development of opposition on the part of the surrounding property owners the application was withdrawn and subsequently the application for a P.A.D. was made.

 As to whether or not the device here employed constitutes a mere subterfuge to evade the restrictions of pure RE–35 zoning we are not to be concerned. Absent a showing that the reasonableness of this ordinance is not fairly debatable, it must be upheld. City of Phoenix v. Fehlner, *supra;* Price v. Schwafel, 92 Cal.App.2d 77, 206 P.2d 683 (1949). The wisdom of the procedure, or more specifically, the reasoning for such is a matter for the legislative branch of government to determine—not the courts. Rubi v. 49'er Country Club Estates, Inc., 7 Ariz. App. 408, 440 P.2d 44 (1968).

Appellants' final argument concerns the procedure followed by appellee Modern Builders in its application for P.A.D. rezoning. The trial court specifically found that Modern Builders' application did not include a "written statement of the general purposes of the project and an explanation of all features pertaining to uses and other pertinent matters not readily identifiable in map form."

The pertinent language of the P.A.D. ordinance provides:

"3. *Explanatory Statement.* There shall be included as a part of the application, a written statement of the general purposes of the project and an explanation of all features pertaining to uses and other pertinent matters not readily identifiable in map form." City of Phoenix Code § 426 B 3.

Appellees counter with the argument that the explanatory statement was only required if in the judgment of the city zoning officials the map was not sufficient, so that in accepting and acting upon the application for the zoning amendment and

approving the same, the city officials necessarily determined the map to be sufficient in all respects. In this connection, the City of Phoenix cites the case of Sulphur Springs Valley Electric Cooperative, Inc. v. City of Tombstone, 99 Ariz. 110, 407 P.2d 76 (1965), wherein the Supreme Court states:

"Unquestionably, there is an area of discretion lodged in city officials in carrying out transactions for the benefit of the City and its inhabitants. In the absence of fraud or bad faith, the validity of their actions will not be entertained by courts."

We first note that while the appellants' allegation is intended to show a jurisdictional defect based upon lack of notice, no allegation has been made or proof offered that the appellants, or any one of them, lacked notice of the proceedings or of the nature and particulars of the proposed development plan. To the contrary, the proceedings before the Planning & Zoning Commission as well as the City Council, were contested in timely fashion throughout all stages of the rezoning procedure.

Moreover, the trial court's finding that an explanatory statement was not filed was never followed by a conclusion that such a statement was required. The only conclusion of law in this regard stated that "the application was regularly filed and also all notices, hearings, reports and actions were taken thereon as required by the Arizona Statutes and the ordinances of the City of Phoenix."

Under the circumstances of this case it is our opinion that the attempt of appellants to tie the lack of an explanatory statement to a jurisdictional lack of notice fails. Appellants' reliance upon the case of Hart v. Bayless Investment & Trading Co., *supra,* is misplaced. In that case the Arizona Supreme Court held invalid a county zoning ordinance which had not been published in a newspaper of general circulation as required by the statutory notice requirements of the enabling act.

 In the case before us, the zoning requirements relating to notice were complied with. *See,* ARS §§ 9-462, 9-463; City of Phoenix Code § 108. Having determined that the requirement of the P.A.D. ordinance concerning the explanatory statement is in essence unrelated to the requirements of public notice, we hold that the explanatory statement is an administrative requirement intended to apprise the city officials of the purposes of the project which may not be gleaned from the site map, so that a failure to comply with the same constitutes a procedural rather than substantive omission which will not form a sufficient basis for invalidating an otherwise valid legislative enactment.

For the foregoing reasons the judgment of the trial court is reversed and the cause remanded with directions to reinstate the validity of P.A.D. 5-69 in all respects.

HAIRE and EUBANK, JJ., concur.